
189 So. 901

## TORTOMASI v. STATE.

### 6 Div. 137.

Court of Appeals of Alabama.

April 4, 1939.

Rehearing Denied May 2, 1939.

Beddow, Ray & Jones, of Birmingham, for appellant.

A. A. Carmichael, Atty. Gen., and Wm. H. Loeb, Asst. Atty. Gen., for the State.

BRICKEN, Presiding Judge.

The undisputed evidence in this case tended to show that this appellant, defendant below, killed the deceased named in the indictment, by shooting him with a pistol. Further, that the killing occurred about 2 o'clock on the night of September 1, 1936, at a filling station in the City of Birmingham, Jefferson County, Alabama.

The State contended, and offered evidence tending to sustain this contention, that the killing was perpetrated without legal excuse or justification; and in this connection insisted that it affirmatively appeared from the evidence that the killing of Nasser by appellant was committed in an unlawful and revengeful manner. That, the defendant sought out, and for several days hunted the deceased for the purpose of taking his life, and when he found Nasser he shot him and that at that time the defendant was not in peril.

On the trial the defendant pleaded justification under the right of self defense, and contended he went into the filling station, at the time stated, where the deceased was shot, for the purpose of arresting him, and that he had a lawful right to arrest the deceased, and that before he was able to arrest deceased that deceased committed the overt act of trying to get his pistol out of his car, making it necessary for defendant to shoot him in order to protect his own life.

It is clearly deducible from all the evidence in this case that the killing aforesaid grew out of the fact that two or three nights before the homicide a truck loaded with about 300 cases of beer was hijacked and stolen near the City of Birmingham, and that this appellant and his associates, Milazzo and Simonetti, were of the opinion that the deceased Nasser was the person who had committed the act.

We deem it advisable, in order to make clear the respective insistences of the State, and the appellant, to quote from the "Statement of Facts" contained in the briefs of the Attorney General, and also from the briefs, of counsel, for appellant.

In this connection we first quote the following from briefs of the Attorney General:

"Charlie Tortomasi, the appellant in this cause, was charged by indictment in the Circuit Court of Jefferson County with the first degree murder of Joe Nasser. The defendant was tried by jury which found him guilty of manslaughter in the first degree and fixed his punishment at ten years imprisonment in the penitentiary. It is from this verdict and the judgment thereon that the defendant now takes this appeal.

"Statement of Facts

"The evidence introduced on behalf of the State tended to show that the defendant, together with Frank Simonetti and N. J. Milazzo, was engaged in the business of transporting beer and whiskey. That one of their trucks had been hijacked, and that the defendant, Simonetti and Milazzo, believing that Joe Nasser was implicated in the hijacking, set out with the avowed purpose of 'getting' Joe Nasser. That in the early morning hours of September 1st this trio spotted Joe Nasser in a filling station located on the corner of Tenth Avenue and Twentieth Street South in the City of Birmingham. That at this time Simonetti and Milazzo were riding in one car and Tortomasi in a second car. That the two cars pulled up to the filling station, that Tortomasi got out of the car in which he was riding, got into the back seat of the car in which Milazzo and Simonetti were traveling, and using the back door for a shield fired at Nasser, inflicting a fatal wound. The entire case built up by the State tended to show a conspiracy on the part of Simonetti, Milazzo and Tortomasi to kill Joe Nasser to avenge the alleged hijacking.

"The testimony introduced on behalf of the defendant was to the effect that Nasser had been identified as the hijacker and that the three operators of the beer-running racket set out to find him to hold him for the police. That when the occupants of the two cars spotted Nasser they pulled into the filling station with the alleged purpose of detaining him until such time as the police came, and that they were carrying their weapons because they knew the general reputation Nasser had for being a violent, turbulent and bloodthirsty individual. That the fatal shot was fired by Tortomasi because Nasser had reached into the glove pocket of his automobile and had come out with a pistol pointing it at Tortomassi."

From the "Statement of Facts" contained in brief of counsel for appellant we quote the following:

"On the night of the 28th day of August, 1936, near midnight or the early morning hours of the 29th day of August, a blue Chevrolet ton and a half truck, loaded with three hundred cases of Champagne Velvet Beer, near Baker's Dairy, on the Birmingham-Leeds Highway, approximately three and a half miles from the City of Birmingham, in charge of Natch Milazzo, was robbed. * * *

"Within a very short period of time the said Milazzo reported to his employers, Charlie Tortomasi and Frank Simonetti, who are the owners of said truck, all that had transpired in connection with said robbery and felonious assault. * * *

"The deceased, the said Nasser, was unknown to Milazzo, but was known by sight to Tortomasi, and intimately known by employes of the sheriff's office and Police Department, and all parties participating in said conference who knew the said Nasser, agreed that one of the individuals implicated in the robbery from his description and that of the automobile used, was none other than Joe Nasser.

"Thereupon demand was made by Tortomasi and Milazzo that Nasser and his three companions be arrested immediately. Said officers declined to make an arrest or attempt to do so until the identity of Nasser was positively established.

"Substantially all of the day of the first of September, from daylight until late in the afternoon, was given over to a search for Nasser, his automobile, or a man filling the description of that given by Milazzo was apprehended, and also a search for the truck was made throughout a greater portion of the day. * * *

"On the morning of the first day of September, 1936, at 1:30 o'clock, A. M., Charlie Tortomasi and a man named A. M. Walters, were proceeding along 20th Street near the intersection of 10th Avenue traveling in a southerly direction in a 1935 Chevrolet Coach. Immediately behind said vehicle, traveling in the same direction, were Natch Milazzo and Frank Simonetti. They were riding in a Ford Coach. * * At the time all of said individuals were headed toward their respective homes. * * *

"Upon reaching a point immediately parallel with, in front of, and opposite the Royal Tire Company's garage and filling station, which is located on the Southeast corner of the intersection of 20th Street and 10th Avenue, Tortomasi, who was driving the Chevrolet, saw standing at the rear of a new 1936 Ford Coach, the man Joe Nasser.

"At that instant the vehicle in which Tortomasi was riding was moving at a rate of speed estimated to be thirty-five or forty miles per hour. Upon noticing the said Joe Nasser, the said Tortomasi shoved his left hand out of the window of his car, signaled the drivers of the car following immediately behind him some fifteen feet, that he was going to slacken his speed or come to a stop. Both vehicles proceeded to a half intersection, which is referred to in the record in this case as a short block named Quinlan Avenue. There Tortomasi made a complete turn, as did Milazzo, who was driving Simonetti's automobile, Simonetti now being asleep, and went to a point immediately in front of said Tire company's filling station. Tortomasi stopped his automobile parallel with said filling station and next to the curb contiguous to the street, Milazzo drove his car to a point within close proximity to and parallel to the automobile of Tortomasi.

"Quickly Tortomasi said to Milazzo, 'There is Joe Nasser, is that the boy that hijacked you?' Milazzo replied, 'Yes, I would know him if I saw him.' Tortomasi then said, 'Let's get in there and hold him for the police. I will move my car out of the street into 10th Avenue.' This he did.

"Immediately upon Tortomasi's parking his car in 10th Avenue he entered the automobile which was being driven by Milazzo, but better known and more definitely identified in the testimony in this case as the Simonetti car. Upon entering said vehicle Tortomasi instructed Natch Milazzo to drive his automobile into the filling station immediately in front of Nasser's car in such way as to block same and so as to prohibit Nasser from leaving said filling station, and Simonetti was instructed by Tortomasi that when Milazzo had followed out instructions that he was to go quickly into the Royal Company's garage and call the police.

"Instantly after Tortomasi had boarded the Simonetti car the said Joe Nasser stepped to a point near the front of his automobile and while pointing the index finger of his right hand in the direction of Tortomasi said, 'You, you little son of a bitch on the back seat, get out and come in here.' Then immediately Nasser stepped back to a point which placed him near the dashboard and glove pocket of his automobile, and then while acting with great speed, opened the door of the glove pocket of his automobile, which was located on the instrument board and on the right side of said automobile, took hold of a nickel-plated automatic pistol, came out of the glove pocket, and as he faced Tortomasi, Tortomasi shot him, Tortomasi having procured a pistol from the glove pocket of the Simonetti car, having reached for same simultaneously with the said Joe Nasser reaching in the glove pocket of his automobile, the testimony tending to show that the said Tortomasi knew at the time that two pistols were in the glove pocket of the Simonetti car. * * *

"The testimony also tends to show that as the said Nasser came out of the glove pocket of his automobile with the automatic nickel-plated Colt, he was acting with such haste that he evidently struck something and the pistol fell from his hand to the floor of his automobile near the front seat.

"The testimony also shows without dispute that Simonetti and Tortomasi both saw Nasser's pistol as he was taking the same from the glove pocket of his automobile, but that same was not in the hand of Nasser when he fell.

"Immediately after the shooting Tortomasi instructed every one to leave things just as they were until the police came. Milazzo remained by the side of Tortomasi and at the scene of the homicide until the police arrived. Frank Simonetti apparently became frightened and left the scene of the homicide. * * *"

In refutation of the State's insistence of a conspiracy between Tortomasi, Milazzo and Simonetti to kill Nasser in order to avenge the alleged hijacking of appellant's truck load of beer, appellant insists that the armed two or three days pursuit of Nasser by himself, and the other designated conspirators, was for the purpose of arresting Nasser which authority he claims is accorded under the provisions of Section 3267 of the Code of 1923, which reads as follows: "A private person may arrest another for any public offense committed in his presence; or where a felony has been committed, though not in his

presence, by the person arrested; or where a felony has been committed, and he has reasonable cause to believe that the person arrested committed it; and an arrest for felony may be made by a private person on any day and at any time."

Section 3268 of the Code of 1923 provides, when a private person undertakes to make an arrest, "He must, at the time of the arrest, inform the person to be arrested of the cause thereof, except when such person is in the actual commission of an offense," etc.

In this case it affirmatively appears that no warrant of arrest for Nasser had been sworn out. The question of the bona fides of the foregoing insistence of appellant, and the contra insistence of the State, was for the jury to consider and determine, and from a careful study of the rulings of the court in this connection we are convinced that appellant was accorded every opportunity and legal right to which he was entitled. As a matter of fact it appears to us that the court permitted appellant an unusually wide scope of inquiry in numerous instances.

On the trial of this case in the court below numerous rulings of the court were invoked and exceptions reserved where such rulings were adverse. We deem it unnecessary to discuss in detail each of these questions, and will refrain from so doing, as no good purpose could be had. We have carefully read and have attentively considered the record in its entirety; including all the evidence, and other matters contained therein. Our conclusion is, that decision here can, and should be rested upon the controlling question as to whether, or not, the defendant in taking the life of deceased, was justified under the applicable law. All questions involved in this proposition, under the conflicting evidence, were for the jury to determine and decide. Clearly, the evidence for the State tended to show a conspiracy existed between this appellant, Natch Milazzo, and others, to take the life of the deceased. This evidence, as hereinabove stated, tended to show that for two or three days and nights these parties, being armed, sought the deceased and when they at last found him, he was killed by one of these parties, this appellant. The accused sought to justify said killing under the law of self-defense. In order to do this, it was encumbent upon him to show that at the time he fired the fatal shot he was in imminent peril, either actual or apparent of suffering grievous bodily injury at the hands of the deceased. The testimony on this question was in conflict. Several witnesses who testified for the State, stated that Nasser at the time he was shot was unarmed and defenseless, and their testimony tended to show he had made no hostile demonstration toward defendant, and that when the fatal shot was fired this appellant stated, "You low livered s. o. a b. you will never hi-jack another one." Police officer Henderson, State witness, testified, in substance, that he, accompanied by another officer, were the first to arrive at the scene after the shooting, and that this appellant stated to him, voluntarily, in reply to his question who shot Nasser, "I shot the s. o. b. and hope he dies—because he hi-jacked my beer." There was other evidence of like import along this line. The defendant strenuously denied making the foregoing statements, but when testifying in his own behalf stated (record, p. 185): "I did not see a pistol in Joe Nasser's hand when he fell. I did not see a pistol in his hand at the time I fired the shot. I said I did not see it when he fell." If the jury, under the required rule, believed from the evidence that at the time defendant fired the fatal shot he was not in imminent peril, either actual or apparent of suffering the loss of his own life or grievous bodily harm, such finding would be conclusive of the case, and there would be no necessity of extending their inquiry further as to the remaining two elements of self-defense—i. e. as to his freedom from fault in bringing on the difficulty, and also the question of the duty of defendant to retreat. The trial court ably and fully instructed the jury as to every phase of the law involved in this case. And after a thorough consideration of every question presented, we are clear to the opinion that no reversible error appears in any of the court's rulings calculated to injuriously affect or impair the substantial rights of the appellant. The record proper being regular and without apparent error thereon, it follows that the judgment of conviction from which this appeal was taken must stand affirmed. It is so ordered.

Affirmed.